UNITED STATES *v.* G. GENNERT, INC. (No. 3779)[1]

[1] T. D. 47388.

United States Court of Customs and Patent Appeals, November 13, 1934

*Joseph R. Jackson,* Assistant Attorney General (*Charles D. Lawrence,* special attorney to the Attorney General, and *Peter A. Abeles,* special attorney, of counsel), for the United States.

*John R. Rafter* for appellee.

*Lamb & Lerch* (*John G. Lerch* of counsel), *amici curiae.*

[Oral argument October 10, 1934, by Mr. Lawrence, Mr. Rafter, and Mr. Lerch]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

G. Gennert, Inc., imported a certain coal-tar preparation called monomethylparamidophenolsulphate at the port of New York, on various dates during 1929 and 1930. In all there were 17 entries of this merchandise, which were afterward included in 17 reappraisement proceedings. The first of said shipments, namely, entry No. W 112359, which was afterwards included in reappraisement No. 90256–A, was entered and appraised at an American selling price of $3.25 per pound. An appeal for reappraisement in that case was made by the collector. The second shipment, entry No. 758067, afterward the subject of reappraisement No. 94048–A, was entered at an American selling price of $3.25 per pound, and was advanced in value by the appraiser to an American selling price of $3.75 per pound, from which appraisement the importer appealed for reappraisement. The remain-

ing 15 shipments were entered with duress additions at an American selling price of $3.75 per pound, the importer claiming the correct value to be $3.25 per pound in each case. These appraisements were also appealed for reappraisement in each case.

Judge Brown, who heard the appeals as a single judge, in each case held $3.25 per pound to be the correct American selling price, and entered judgment accordingly. The Government appealed in all cases. Upon hearing of these reappraisement proceedings, which had been consolidated, the appellate division affirmed the decision and judgment of the single judge, except as to the last 15 duress entries, and as to these the judgment was reversed and the cause remanded to the single judge with directions to dismiss these appeals on the authority of *Innis, Speiden & Co.* v. *United States*, 19 C. C. P. A. (Customs) 1, T. D. 44789.

. No error having been assigned as to this holding upon 15 duress entries, the question of its correctness is not before us here, and the judgment as to such holding must be and is affirmed.

From the resulting judgment the Government appeals in said reappraisements No. 90256–A and No. 94048–A. The errors assigned are many. The Government's contentions are, in brief, that the record disclosed that the dutiable value of the merchandise was $3.75 per pound; that the importer had not sustained the burden of proof, and, in fact, had entirely failed to prove that $3.25 per pound was the American selling price of the imported goods; that the trial court had improperly and erroneously failed to permit the Government, on the trial, to prove certain facts, and to ask certain questions, which will be more particularly referred to hereinafter, and that the appellate division was in error for not having so found. Error was assigned in the appellate division to this line of rulings by the trial judge, by incorporating in the fifteenth assignment a statement of certain questions which were asked and to which objections on the part of the importer were sustained. These same questions are included in the tenth assignment of error in this court.

While it is insisted in this court, by the Government, that the importer has made no proof of an American selling price of $3.25 per pound, and that the only American selling price shown by the record is $3.75 per pound, and that, therefore, the judgment below should be reversed on that ground, the ground for reversal more specifically urged is that the trial judge improperly refused to permit the asking of the questions by Government counsel hereinbefore referred to. Most of the argument of counsel is upon this point, and it is to this specific matter that we shall direct our attention.

The imported material was dutiable under the provisions of paragraph 28 of the Tariff Act of 1922, and was, concededly, dutiable at

a rate based upon the American selling price as defined in subdivision (f) of section 402, title IV of the said act, which is as follows:

The American selling price of any article manufactured or produced in the United States shall be the price, including the cost of all containers and coverings of whatever nature and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for delivery, at which such article is freely offered for sale to all purchasers in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities in such market, or the price that the manufacturer, producer, or owner would have received or was willing to receive for such merchandise when sold in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported article.

The evidence discloses that the imported chemical is also made in the United States by at least three manufacturers, namely, Rhodia Chemical Co., Eastman Kodak Co., and Sherlow Chemical Co., and is sold by them under their individual trade names, .viz, Rhodol, Elon and Graphol. The imported material, as shown by the invoices in reappraisement No. 90256–A, consisted of 1,000 pounds, packed in tins of 50 and 10 pounds, and in reappraisement No. 94048–A, of one 10-pound can.

The principal controversy in this case resolves itself into a consideration of what were the usual wholesale quantities in which the domestic product was sold in the principal market of the United States in the ordinary course of trade at the time of the exportation of the imported goods. On the part of the Government, it was attempting to prove that the domestic product was being sold and offered for sale in the ordinary course of trade at said time, in quantities of much less than the quantities imported by appellee, and which said first-mentioned quantities were in the ordinary course of trade and were in the usual wholesale quantities. It was contended by the Government that there were two classes of purchasers for this product, the motion-picture-film producing trade on the one hand, and the drug stores and photographic-supply houses on the other hand; that the majority of the sales in number were to drug stores and photographic-supply houses, and that these sales were in usual wholesale quantities, and that they were in small quantities ranging from a few ounces upward, many of them being 5 pounds; that the question of what constituted usual wholesale quantities in the ordinary course of trade was to be determined by the major number of sales which were made at wholesale. The Government insists that it attempted to establish the number and quantity of such sales, and its principal cause of complaint here is that the trial judge would not permit the introduction of testimony to establish these facts.

On the other hand, the importer contended, in both of the lower courts, that sales in quantities of less than 10 pounds did not constitute sales in the usual wholesale quantities, and that testimony on

this point could not properly be introduced. The trial judge adopted this view and upon appeal to the appellate division, while the question of the admissibility of this testimony was not directly passed upon, by implication and by the affirmance of the decision of the trial judge, the rulings on the admissibility of this testimony were approved.

The tenth assignment of error made by the Government here sets out *in haec verba* 17 questions, to all of which, it is claimed, objections were sustained, and which questions are as follows, and which, for convenience, we have numbered in the margin:

1. Q. Please state the price at which the Rhodia Chemical Company freely offered monomethylparamidophenolsulphate during the year 1929.

2. Q. And from those records can you tell what the freely offered price of this commodity was during 1929? Can you?

3. Q. What proportion of pictol, in your opinion, in the United States is consumed by the motion-picture industry?

4. Q. Is the quantity of pictol sold to the motion-picture industry greater or less than that sold to the rest of the industries?

5. Q. During your experience, will you state what you have found to be the average quantity which the motion-picture industry buys?

6. Q. Have you, during the years 1929 and 1930 and 1931, made a practice of offering pictol to the motion-picture trade at prices lower than to other trades?

7. Q. What during your experience have you found to be the usual wholesale quantity of pictol sold to industries other than the motion-picture industry?

8. Q. At what price did you offer 5 pounds of pictol in the years 1929 and 1930?

9. You said that the price was a little less for the packing in larger quantities. What did you mean by that?

10. Q. Now, how much of your business, your sales, of pictol during 1929 and 1930, what proportion of it was at 5 pounds, as compared to the quantity sold to the motion-picture industry?

11. Q. What proportion of your business in this commodity is for 25 pounds and under?

12. Q. During 1929 and 1930, can you state approximately the number of individual customers for pictol you had in the motion-picture industry?

13. R. Q. Now, then, will you state to what industries you sell the rhodol?

14. R. Q. At what price did you offer rhodol, 5-pound quantities, during that period?

15. R. Q. Of the entire quantity of rhodol sold by you, how much did you sell any quantity at $3.75 per pound or higher?

16. R. Q. During that period, can you state approximately the number of individual customers for rhodol you had in the motion-picture industry?

17. R. Q. And during that period, can you state approximately the number of individual customers for rhodol you had in the general photographic industry?

It is contended by the appellee that of these questions No. 12 was answered in the record. This appears to be true.

It is also contended by counsel for appellee that, as to four of the other questions, no exceptions were preserved, and that, therefore, these questions ought not to be considered. It is true that no exceptions were specifically preserved to these questions. However, we deem this to be unnecessary, in view of the statement of Judge Brown during the course of the trial. Counsel for the Government was

preserving an exception to a ruling of the trial judge, excluding testimony offered by the Government as to the usual wholesale quantities. Judge Brown then stated:

You get an exception to that whole line. I think you have stated your position very clearly at the beginning. It is all covered by the same ruling.

In this inquiry as to the American selling price, it was proper and essential to ascertain the price at which the imported article was freely offered for sale to all purchasers in the principal market of the United States in the ordinary course of trade and in the *usual wholesale quantities* in such market, or, in the alternative, the price which the manufacturer, producer, or owner would have received, or was willing to receive for such merchandise, all as specified by said section 402 (f) of the Tariff Act of 1922.

The inquiry was not as to the price of the domestic product to wholesalers, but the price in the usual wholesale quantities, as said by us in *United States* v. *Richard & Co.*, 15 Ct. Cust. Appls. 143, T. D. 42216. While the case just cited had reference to the foreign value, no reason is seen why the suggestions there made as to the usual wholesale quantities are not equally applicable to an American selling price under said section 402 (f).

"It seems quite obvious that the usual wholesale quantities, as used in this statute, should be held to refer to a major portion of the sales or offers for sale of the merchandise in question, and that sporadic sales or sales in minor quantities should not be held to constitute *usual* wholesale quantities." *Pleissner* v. *United States*, 16 Ct. Cust. Appls. 507, 510, T. D. 43237. The same conclusion was reached in our later case, *United States* v. *Minkus*, 21 C. C. P. A. (Customs) 382, 388, T. D. 46912.

It was material in this proceeding before Judge Brown to ascertain what were the usual wholesale quantities in which this merchandise was freely offered for sale in the principal market of the United States at the time of exportation of these imported goods, as upon the determination of this question, the ultimate valuation to be placed upon the imported goods for duty purposes should be fixed. If the American selling price were to be based upon offers for sale to a certain class of purchasers, such American selling price might be one figure, while, if it were to be based upon offers for sale to another class of purchasers, a different valuation might result. The Government was contending that the sales to drug stores and photographic-supply houses were in the ordinary course of trade and in the usual wholesale quantities, and that these constituted the major quantities of sales and the usual wholesale quantities upon which the American selling price must be fixed.

It was essential that a full and impartial investigation of this matter be had, and a failure to permit the introduction of material

testimony constitutes error. *United States* v. *General Dyestuff Corp.*, 19 C. C. P. A. (Customs) 410, T. D. 45577.

An examination of the questions included in the tenth assignment of errors, to which questions objections were sustained, leads to the conclusion that the various matters included in said inquiries were material and relevant to the issues in the trial court. They were proper for the purpose of ascertaining what the usual course of trade was, and what the usual wholesale quantities were, in the principal American market, of products which were admittedly the same as the imported product, even though known by different names. In connection with the sustaining of objections to these inquiries, counsel for the importer was contending, and the trial judge consistently held, that no sales of quantities less than 10 pounds could be considered as in the usual wholesale quantities. So far as the record discloses, this ruling was not based upon anything appearing of record, but was a holding by the court, based upon the court's theory of what constituted such usual wholesale quantities.

Counsel for the appellant, in pursuance to the proper practice, offered to prove certain facts which he expected to adduce in answer to some, at least, of these questions. *Meyer & Lange* v. *United States*, 12 Ct. Cust. Appls. 15, T. D. 39892.

Inasmuch as the law does not so provide, but rather gives to the parties the right to prove in each instance what does constitute the usual wholesale quantities, the case was tried upon the wrong theory by the trial court, and hence it was error for the appellate division to refuse to reverse and remand the cause for a new trial. The case not having been tried upon its merits, but upon a wrong theory of law, this constituted error which the reviewing divisio should have declared. *United States* v. *Metro-Goldwyn-Mayer Corp* 19 C. C. P. A. (Customs) 119, T. D. 45247.

For the reasons assigned, the judgment of the United States Customs Court, Third Division, is *reversed* as to said reappraisements Nos. 90256–A and 94048–A, and the cause is *remanded* with directions to remand the same to the single judge for a new trial upon said reappraisements.

In view of such ruling, it is unnecessary to pass upon the other errors assigned.